# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 575 | **DATE** | 8/27/2003 |
| **CASE TITLE** | Shales vs. Gen. Chauffeurs Salesdrivers et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, defendants' motion for judgment as a matter of law [135-1] or, in the alternative, motion for a new trial [135-2] are denied. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | 142 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | CLERK, U.S. DISTRICT COURT | 8/27/2003 | |
| | Copy to judge/magistrate judge. | 03 AUG 27 AM 10: 5 | date mailed notice | |
| KF | courtroom deputy's initials | Date/time received in central Clerk's Office | KF mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JAMES D. SHALES,         )
                             )

      Plaintiff,      )

                             )    **No. 00 C 575**

    v.                         )

                             )    **Mag. Judge Michael T. Mason**

GENERAL CHAUFFEURS,    )
SALESDRIVERS AND HELPERS  )
LOCAL UNION NO. 330, et al.,   )
                             )

      Defendants.   )

AUG 2 8 2003

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

On January 28, 2000 plaintiff James D. Shales filed suit against defendants General Chauffeurs, Salesdrivers and Helpers Local Union No. 330 ("Local 330" or the "union"), Jim Butt, Joseph Degand, the estate of Francis "Mike" Hruby, and Tyler Lanning (collectively, "Union Defendants"), and Brady Ready Mix Company ("Brady") and Meyer Material Company ("Meyer", or collectively, "Employer Defendants"). The case went to trial on June 2, 2003. Before the case went to the jury, defendants filed a Motion for Judgment as a Matter of Law. Magistrate Judge Mason denied this motion and so the jury deliberated. On June 12, 2003, the jury returned a general verdict in favor of plaintiff, awarding him a total of $171,500.00 in compensatory damages and $250,000.00 in punitive damages. Defendants now move for this Court to enter judgment in their favor on Counts I, and III-IX of the complaint, and for a reduction in the judgment amounts, or alternatively, for a new trial.

## I. Background

The following facts are generated from plaintiff's Second Amended Complaint as admitted by defendants in their Answer:

Plaintiff James H. Shales was a member in good standing of Local 330 and the International Brotherhood of Teamsters, AFL-CIO ("IBT") from 1983 until July 30, 1999, when he was suspended from membership. Local 330 employed Shales as an appointed Business Agent from January 1, 1990 until August 7, 1997. Before working for Local 330, Shales was an employee of Brady from 1983 until December 31, 1989. Shales was re-employed by Brady, now known as Meyer, sometime at the end of March or the beginning of April, 1998.

Defendant Local 330 is a local labor union that is affiliated with the IBT. It is a labor organization within the definition of 29 U.S.C. § 152(5) and § 402(i). Union Defendants were all officers and members of the Executive Board of Local 330 during all times relevant to this suit. Defendant Brady, which was succeeded in interest by Meyer, was an employer within the definition of 29 U.S.C. § 152(2); one or the other entity was a party to a collective bargaining agreement with Local 330 during all times relevant to this suit.

Plaintiff Shales was elected the Recording Secretary of Local 330 in 1997; he also retained his employment as Local 330's Business Agent. On or about August 1, 1997, Shales announced his intention to run against the incumbent president of Local 330, Donald P. Smith, in the approaching local union election. On August 4, 1997, President Smith issued a written "Modifications in Work Assignment" to Shales, advising him, among other things, that he could not talk about his campaign

on union time. The "Modification" also required Shales to include two other Business Agents in all of his work activities. President Smith fired Shales from his position as Business Agent on August 7, 1997. A month later, in September 1997, the Local 330 Executive Board relieved Shales' of his duties for his elected position as Recording Secretary of Local 330.

On December 6, 1997, Smith defeated Shales by three votes and was re-elected as President of Local 330. Defendants Butt, Degand, Hruby, and Lanning ran on President Smith's slate in the union election against Shales' slate. Shales protested the election to Joint Council 25 ("Joint Council"), an affiliate of the IBT, in December 1997, but the Joint Council denied his protest in April 1998. Two days after receiving the denial, Shales appealed the Joint Council's decision to the IBT General Executive Board. In May 1999, the Board denied his protest and dismissed his appeal. A week after the denial of his appeal, Shales filed a complaint with the Secretary of Labor in accordance with 29 U.S.C. § 482(a)(1).

In or about March, 1998, Shales returned to work for Brady, now Meyer. Shales had been employed by Brady before he went to work for Local 330, and in returning he relied on a notarized side letter of agreement ("Side Letter"), between Union No. 300 and Brady dated April 2, 1990. The Side Letter granted Shales a leave of absence to work for Local 330 and preserved his right to return thereafter with no loss of seniority, seniority position, and/or seniority rights.

When Shales returned to Brady in March 1998, a copy of the leave of absence agreement was posted on the union bulletin board at the company. James Hickey and a few other employees of Brady filed a grievance dated March 23, 1998

3

claiming that they would be disadvantaged by having Shales placed above them in seniority and that Shales was not entitled to his seniority.

On April 8, 1998, a grievance panel comprised of three union and three employer representatives held a hearing on the grievance. Local 330 President Smith and defendant Degand represented the grievants. They claimed that Shales was not entitled to seniority rights for the period he worked as a Business Agent because the Side Letter was fabricated. The grievance panel upheld the grievance against Shales.

A few days after the April 8, 1998 grievance hearing, Shales requested that Local 330 reconsider the grievance panel's decision. Although Shales provided President Smith with information substantiating the validity of the Side Letter, Local 330 failed to process his grievance.

On April 12, 1998, President Smith filed internal union charges against Shales alleging that Shales had used a counterfeit leave of absence agreement to circumvent the rightful seniority of other Teamsters. In addition to filing charges against Shales, President Smith sought Shales' expulsion from Local 330. A hearing on President Smith's charges was scheduled for April 26, 1998. Despite Shales' request to extend the date of hearing so that he may have time to prepare his defense and to allow one of his key witnesses to testify, the hearing took place before the Local 330 Executive Board on April 26, 1998.

At the hearing, President Smith claimed that Shales fabricated the April 2, 1990 leave of absence agreement. Shales defended himself by presenting evidence that the leave of absence agreement was notarized and that the notary public

4

verified her signature and seal. At that time, the Local 330 Executive Board included defendants Butt, Degand, Hruby, and Lanning, as well as President Smith and Kelly Nedler. The Executive Board sided with President Smith and decided that Shales forged the leave of absence agreement. The Board also voted to expel Shales from Local 330 membership.

Shales appealed the Executive Board's decision to Joint Council 25. After reviewing the record made at the April 26, 1998 hearing, Joint Council 25 denied Shales' appeal on October 6, 1998 but reduced his penalty to a three year suspension from the union. On October 9, 1998, Shales filed an appeal with the IBT General Executive Board. On July 30, 1999, they affirmed the decision of Joint Council 25 to suspend Shales for three years, and dismissed Shales' appeal.

President Smith passed away in 1999. Defendant Hruby succeeded Smith as Local 330 President and defendant Degand became the Local 330 Secretary-Treasurer. Hruby later retired, and Degand succeeded him as President of Local 330. Degand has held this position to date.

On June 5, 2000, Dominic Romanazzi, the Secretary-Treasurer of Local 330 at that time filed internal union charges against Shales, alleging that Shales had threatened him on two occasions. The Local 330 Executive Board held a hearing on Romanazzi's charges on July 27, 2000. At the time of this hearing, the Executive Board consisted of defendant Degand, the President of Local 330 at that time, and James Hickey, Sam Campus, Nick Puccini, and Gary Johnson. The Executive Board found Shales guilty of threatening a union official and intimidation. They imposed a $3,000 fine and a three-year suspension on Shales to run consecutive

5

with the suspension he was already serving.

Just over a month after Romanazzi filed charges, on July 18, 2000, defendant Degand, the President of Local 330 at that time, filed more internal union charges against Shales, alleging violations of the collective bargaining agreement. The Local 330 Executive Board held a hearing on Degand's charges against Shales on August 24, 2000. In September 2000, the Local 330 Executive Board found Shales guilty of violating the IBT Constitution. They imposed another $3,000 fine on Shales and permanently expelled him from Local 330.

To seek relief and compensation for what he believed were the unlawful actions of the defendants, Shales filed suit against Local 330, the Union Defendants, and the Employer Defendants. We will set forth each count of his complaint, since the parties' briefs discuss the evidence adduced at trial on a count-by-count basis.

In Count I plaintiff alleges that his termination was "part of a pattern of intimidation by the Union Defendants intended to suppress dissent within the union, in violation of Sections 101(a)(1), (a)(2) and 609 of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411 (a)(a), (a)(2) and 529, and they did so intentionally and in bad faith."

Counts II alleges that the Union Defendants intentionally, and in bad faith, denied Shales his due process rights guaranteed by Section 101(a)(5) of the LMRDA, 20 U.S.C. §§ 411(a)(5), in violation of Section 609 of the LMRDA, 29 U.S.C. § 529 with respect to the Union discipline and penalties imposed on Shales in response to President Smith's April 12, 1998 internal union charges against Shales. ("Smith charge")

6

Counts III and IV allege respectively that through the Union discipline and penalties imposed on plaintiff Shales in response to defendant Romanazzi's June 5, 2000 and defendant Degand's July 18, 2000 internal union charges against Shales (respectively, "Romanazzi charge" and "Degand charge"), the Union defendants, excluding defendants Butt and Hruby, denied Shales his due process rights guaranteed by Section 101(a)(5) of the LMRDA, 29 U.S.C. §§ 411(a)(5), in violation of Section 609 of the LMRDA, 20 U.S.C. § 529 and they did so in bad faith.

Count V alleges that through the discipline and penalties imposed on Shales in response to the Smith charge, the Romanazzi charge and the Degand charge, the Union Defendants disciplined Shales in violation of his rights of free speech and assembly and his equal rights and privileges to participate in the affairs of the Union guaranteed by Sections 101(a)(1) and (a)(2) of the LMRDA, 29 U.S.C. §§ 411(a)(1) and (a)(2), in violation of Section 609 of the LMRDA, 29 U.S.C. § 529, and they did so intentionally and in bad faith.

Count VI through VIII allege respectively that through the Union discipline and penalties imposed on Shales in response to the Smith charge, the Romanazzi charge and the Degand charge, the Union Defendants violated the Local 330 Bylaws and the IBT Constitution, in violation of Section 301 of the LMRDA, 29 U.S.C. § 185, and they did so intentionally and in bad faith.

Finally, Count IX alleges that the Employer Defendants violated Shales' rights under the collective bargaining agreement by depriving him of his seniority rights, and the Union Defendants arbitrarily and in bad faith violated their duty of fair representation by failing to process Shales' grievance regarding the Side Letter.

On June 12, 2003, the jury in this case deliberated on the aforementioned claims and rendered a verdict for Shales against defendants Local 330 and Union Defendants Jim Butt, Joseph Degand, Tyler Lanning, and the Estate of Francis "Mike" Hruby. The jury awarded Shales compensatory damages in the total amount of $171,500 and punitive damages in the total amount of $250,000. Presently before the Court is Defendants' Renewed Motion for Judgment as a Matter of Law or, In the Alternative, For a New Trial ("Motion JMOL"). In this motion, defendants request that we enter judgment in their favor on all counts of the Complaint or that we reduce the damage amounts awarded to the plaintiff by the jury pursuant to Federal Rule of Civil Procedure 50(b). Alternatively, defendants seek a new trial pursuant to Federal Rule of Civil Procedure 59. For the following reasons, the Motion JMOL is DENIED.

## II. Legal Standards

### A. Federal Rule of Civil Procedure 50(b)

Federal Rules of Civil Procedure 50(b) and 59 differ in their applicable standards of review. Fed.R.Civ.P. 50(b) permits the Court to enter as a matter of law on a claim if "there is not legally sufficient evidentiary basis for a reasonable jury to find for th[e] [non-moving] party on [an] issue" necessary to the maintenance of that claim. Fed.R.Civ.P. 50(a)(1). When conducting a Rule 50 inquiry, the Court must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed . . . In other words [the Court is] limited to assessing whether no rational jury could

8

have found for the [non-moving party]." *Mathur v. Bd. of Trustees of So. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000) *quoting Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627,629 (7th Cir. 1996). The Court's review of defendants' request under Fed.R.Civ.P. 50(b) will be limited to the grounds defendants "advanced in their pre-verdict motion." Fed.R.Civ.P. 50(a)-(b); Advisory Committee notes to the 1991 Amendments to Fed.R.Civ.P. 50 ("[T]he post-verdict motion is a renewal of an earlier motion made at the close of the evidence ... A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.")

### B. Federal Rule of Civil Procedure 59

Under Fed.R.Civ.P. 59, however, "a district court may properly grant a new trial if the verdict is contrary to the clear weight of the evidence." *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 434 (7th Cir. 1992); *see also* 11 Charles Alan Wright, [hereinafter "Wright, Miller & Kane] (Under Rule 59, "[i]f having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial").

## III. Discussion

### A. Liability

#### 1. Count I

In Count I of the Second Amended complaint, plaintiff Shales alleges that his termination violated Sections 101(a)(1), (a)(2) and 609 of the LMRDA, 29 U.S.C. §§ 411 (a)(1), (a)(2) and 529. The LMRDA "was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S.

431, 435 (1982). The basic goal of the LMRDA "was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Id.* at 441. *See also Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 354-355 (1989). Specifically, Section 609 of the LMRDA protects union members from discipline in retaliation for the exercise of their LMRDA rights.

Defendants argue that plaintiff's 29 U.S.C. § 529 claim fails as a matter of law. They cite *Breininger v. SMWIA, Local No. 6*, 493 U.S. 67, 91 (1989), and *Finnegan*, 456 U.S at 438, to assert that Section 529 only protects union members' membership rights, "not their employment rights with respect to a union." Although this is a true statement, we disagree that the Section 529 claim fails as a matter of law. Sufficient testimony and evidence was presented at trial from which a reasonable jury could conclude that Shales' membership rights were harmed. A reasonable jury could conclude that the members of Local 330, including Shales, enjoyed the right to see a democratically elected official, such as a Recording Secretary fulfill his elected office, and that these rights were harmed when the defendants removed Shales' duties. Furthermore, a reasonable jury could conclude that the internal union charges filed against Shales by some of the Union Defendants were detrimental to Shales' membership rights because these charges ultimately led to Shales' expulsion from Local 330.

Defendants also argue that insufficient evidence was presented at trial from which a reasonable jury could conclude that Shales' termination was part of a pattern to deliberately suppress dissent within the local in violation of Section 411.

10

*See Finnegan*, 456 U.S. at 441 (recognizing that the LMRDA limits a union's power to use dismissal from union office as "part of a purposeful and deliberate attempt . . . to suppress dissent within the union."). Defendants claim that Shales was not removed from his elected position as recording secretary but was only relieved of the duty of keeping the minutes of the meeting. Additionally, defendants argue that Shales' termination as Business Agent was not a deliberate effort to suppress dissent within the local union because the internal union bodies who considered this evidence denied that he was deliberately terminated to suppress his dissent.

Contrary to defendants' assertions, we find that given the evidence and testimony at trial, a reasonable jury could conclude that Shales' termination was part of a deliberate attempt to suppress dissent. A jury could deduce that Shales began to have trouble with Local 330 only after he expressed his desire to run in the election in 1997. The undisputed evidence shows that President Smith terminated Shales on August 7, 1997, just six days after he announced his intentions to run against Smith for president. And within days of Shales' termination, defendants removed all of his significant duties as Recording Secretary, in effect removing him from his post. *See Lynn*, 499 U.S. at 355 (recognizing that removal of elected union official not only denies union members of their chosen representative but also has the potential for chilling free speech). Also in support of his argument that the actions of defendants harmed his right to run a legitimate campaign for president, Shales points out that in *McCormick v. Zero*, 110 F.Supp.2d 716, 739 (N.D. Ill. 2000) *vacated on other grounds*, the Court recognized:

[i]ncumbency has natural advantages in any election: By

carrying out his duties well and by serving members of the Union, an incumbent may demonstrate his knowledge of members' problems, activism, competence and energy on behalf of members and the necessary skill, judgment and determination in dealing with employers.

Accordingly, the evidence clearly would support a reasonable jury's finding that Local 330 terminated Shales as Business Agent and removed Shales from his duties as Recording Secretary to deliberately hinder his campaign against Smith, and therefore, to deliberately suppress dissent.

### 2. Counts II, III, and IV

Counts II, III, and IV each challenge a separate internal union charge filed against Shales after he announced his intent to run against President Smith. These charges were respectively filed by President Smith, Romanazzi, and Degand. After deliberating on the evidence and testimony presented at trial, the jury found each of these internal union charges violated Shales' rights guaranteed by the LMRDA.

Defendants concede, and plaintiff agrees that, there was insufficient evidence to convict Shales of the Smith charge in Count II. At trial, evidence was presented that Smith destroyed the union's copy of the leave agreement in front of Degand and that he falsely told the trial body that it could not be located. Smith used his own false testimony to expel Shales from the Union and "strip him of all membership benefits including the right to compete against them for the presidency of the Union." Thus, the jury reasonably concluded that Smith's internal union charge against Shales alleging that he used a counterfeit leave agreement, which culminated in Shales' suspension, was unwarranted and violated the LMRDA by unjustly denying Shales his membership rights.

In Count III, Shales claims that he was denied his due process rights guaranteed by Section 101(a)(5) of the LMRDA with respect to the internal union charge Romanazzi filed against him. In *Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 245 (1971), the United States Supreme Court noted that to satisfy Section 101(a)(5), a union member subject to discipline should be "served with written specific charges . . . specific enough to inform the accused member of the offense that he has allegedly committed." The evidence in this case shows that at his hearing on the Romanazzi charges, Shales stated that he was unaware of the charges against him. The evidence also shows that when Shales requested information about the charges against him, he was expelled from the hearing. Although defendants claim that "Shales did not contest the [Romanazzi] charges in Count III because he disrupted the hearing and ignored two warnings that his conduct would lead to his expulsion," they did not deny that Shales was not informed about the charges against him.[1] Thus, despite any disruptions that may have occurred at the hearing, given the evidence at trial, a reasonable jury could conclude that Shales' rights guaranteed by Section 101(a)(5) of the LMRDA were violated because he did not receive adequate notice of the charges against him in order to prepare his defenses and gather witnesses.

Furthermore, the Seventh Circuit has found that "as a matter of fundamental due process, it is inherently improper for a person who has been charged by an accused in a collateral proceeding to participate as a committee member in the

---

[1] Defendants also do not address the fact that the disruption was caused by Shales' attempt to learn the charges against him prior to the hearing.

13

accused member's disciplinary hearing." *Tincher v. Piasecki*, 520 F.2d 851, 855 (7th Cir. 1975). At trial, Shales presented evidence that "Degand sat on the Executive Board that heard the Romanazzi charge against Shales even though at the time of the Romanazzi hearing, Degand had already filed charges against Shales, and Shales had brought charges against Degand. Since the jury was informed of Degand's involvement with the Romanazzi charge and learned that Degand sat on the panel at the Romanazzi hearing, the jury was presented with enough evidence to reasonably conclude that the Romanazzi hearing violated Shales due process rights as defined by *Tincher*, 520 F.2d 851, and that Shales was prejudiced in the presentation of his defense. *Hardeman*, 401 U.S. at 245.

In Count IV Shales claims that he was once again denied his due process rights guaranteed by the LMRDA because he did not get a fair hearing on Degand's charge against him that Shales assaulted Degand with a water hose. As previously mentioned, Shales was entitled to adequate notice of the charges against him. *See Hardeman*, 401 U.S. at 245. At trial, Shales presented evidence that he did not receive notice of the substance of the charges Degand filed against him and thus, he could not present an adequate defense. Accordingly, as we found for count III, a reasonable jury could conclude that his rights guaranteed by the LMRDA were violated with respect to count IV of the Second Amended Complaint.

Furthermore, plaintiff claims that his LMRDA rights were violated with respect to Degand's charges against him because various members of the executive board were biased against him, which impaired his ability to receive a full and fair hearing on Degand's charges. Section 101(a)(5)(C) of the LMRDA guarantees union

14

members a "full and fair" hearing.  Plaintiff presented evidence at trial that prior to

Shales' hearing on his charges, Degand recommended that Shales' membership in

the union be permanently extinguished.  Additionally, several of the board members

who heard the August 2000 charges testified that they thought that Degand was the

man who "ran the show" and that they knew of his recommendation to expel Shales.

Thus, we find that the jury heard actual evidence of bias against Shales and thus

reasonably concluded that the panel was either biased in favor of Degand or

otherwise involved in the charge, preventing Shales from receiving a "full and fair"

hearing as required by the LMRDA.[2]

### 3. Counts V, VI, VII, and VIII

Defendants claim that Counts V, VI, VII, and VIII must fail under *Hardeman*,

401 U.S. at 234-235, 245-246.  In their motion, defendants note that in *Hardeman*,

the Supreme Court held that "in order to sustain the propriety of intra-union

discipline, there must be: 1) written, specific charges; 2) a reasonable time to

prepare a defense; 3) a full and fair hearing; and 4) "some evidence" supporting the

charge." *Id*. The Seventh Circuit stressed the necessity of a full and fair hearing

when determining union discipline in *Tincher,* 520 F.2d at 854.  In *Tincher*, the Court

asserted:

> While the union member need not necessarily be
> provided with the full panoply of procedural safeguards
> found in criminal proceedings, the fundamental and

---

[2] The jury instruction regarding this count informs the jury that bias may be established or inferred by facts such as pecuniary interest, personal animosity, or prejudgment of Shales' case on the part of one or more decision makers.  A reasonable jury could conclude that there was evidence of Degand's animosity toward Shales, and that some members of the Board had pre-determined Shales' guilt before attending the hearing, based on Degand's recommendation.

> traditional concepts of due process do apply to the union disciplinary hearing. An essential element of a full and fair hearing is an impartial tribunal which arrives at a decision on the basis of evidence which the accused has an opportunity to confront and rebut.

*Id.* (citations omitted).

Defendants argue that the Local 330 trial board heard "some evidence" of plaintiff Shales' guilt, and accordingly, the board's findings were appropriate. In his response to defendants Motion, Shales conceded that the Local 330 trial board heard "some evidence" to support its action, but argued that this evidence was tainted. At trial, Shales presented evidence which demonstrated that the Union Defendants knew that some of the hearing evidence on which they based their actions was false. Plaintiff asserts that the evidence at trial demonstrates that the board knew that defendants "intentionally destroyed evidence and submitted false and perjurious (sic) testimony to the board designed to eliminate Shales from [Local 330]." Plaintiff also emphasizes that the Local 330 trial board was comprised of political opponents of Shales. Accordingly, we find that the jury in this case could reasonably conclude that the evidence presented at the charge hearings was not reliable, and thus the internal union hearings discussed in Counts V, VI, VII, and VIII violated Shales' due process rights guaranteed by the LMRDA.

### 4. Count IX

In Count IX plaintiff alleges that the Union Defendants arbitrarily and in bad faith violated their duty of fair representation by failing to give him adequate notice about the grievance against him concerning the Side Letter and by failing to

16

represent him in his own grievance concerning the agreement. This count also alleges that the Employer defendants violated Shales' right to seniority by failing to uphold the Side Letter.[3]

Several witnesses at trial testified that side letters of agreement, like the one in this case – which allowed a leave of absence beyond those granted in the collective bargaining agreement – were common in the Teamsters Unions and other labor organizations. At trial, T.E. Mitchell, the owner of Meyer, testified that he entered into the Side Letter in order to allow Shales to return to his seniority at Defendant Employers if he ever left Local 330. Mitchell also testified that he was always willing to honor the Side Letter. Thus, the jury was presented with enough evidence to reasonably conclude that Union Defendants breached their duty to fairly represent Shales by refusing to process his grievance regarding the Side Letter, especially because the defendants actually went out of their way to harm Shales' employment and union membership rights by concocting a false story about the agreement. Given that Smith was president of the union at the time it refused to process Shales' grievance, it is not unreasonable for the jury to conclude that Local 330 failed to process Shales' grievance on the issue because Smith directed it not to do so. Thus, we uphold the jury's verdict on this issue.

### B. Damages

A court must "review damages evidence in the light most favorable to the

---

[3] Defendants do not argue that we should overturn the jury's verdict with respect to Shales' claims against the Employer Defendants. In any event, a 2001 settlement between Shales and Meyer that states that Meyer will return Shales' rightful seniority and benefits should a court proceeding conclude in favor of Shales disposes of Shales' claims against his employer.

jury's verdict, and the verdict must stand unless there is no rational connection between the evidence and the jury's award." *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993)(internal citations omitted). For the following reasons, viewing the evidence presented at trial in a light most favorable to the plaintiff, we believe that a rational connection exists between the evidence of harm suffered by Shales and the jury verdict in his favor.

### 1. Compensatory Damages

At trial, Shales requested $309,032.99 in compensatory damages for lost wages, lost personal days, and lost benefits from the date of his discharge, August 7, 1997, until the date of his trial. The jury awarded Shales compensatory damages in the total amount of $171,500, about 55 percent of his demand. Specifically, the jury awarded Shales compensatory damages of $102,900 against Local 330, $8,575 against Butt, $25,725 against Degand, $8,575 against Lanning, and $25,725 against the Estate of Hruby.

Defendants ask that we either vacate or reduce the jury's award of compensatory damages. Defendants argue that we should limit the back pay claim to the period of August 7, 1997 through December 31, 1997 because they claim that Shales' employment with Local 330 would have ended on December 31, 1997 because he chose to run for the presidency of Local 330. However, we believe that the question of whether Shales would have continued to enjoy the benefit of employment with Local 330 if not for the actions of the defendants was a question for the jury, and the jury's reduction of the amount of compensatory damages Shales' requested reflects the uncertainty about his continued employment with the

18

union. Since we find that the evidence supports the jury's verdict in favor of Shales, we also uphold the jury's verdict awarding Shales' compensatory damages. *See Mary Best G. and Sharon N. v. City of Chicago*, 723 F.2d 1263, 1275 (7th Cir. 1983), citing *Huff v. White Motor Corp.*, 609 F.2d 286, 296 (7th Cir. 1979); *Galard v. Johnson*, 504 F.2d 1198, 1199 (7th Cir. 1974)(holding that in reviewing a jury verdict for damages to determine whether it is excessive, courts must defer to the judgment of the jury unless the award is "monstrously excessive" or "so large as to shock the conscience of the court." ).

Defendants argue that we should not only limit the amount of back pay Shales receives, but we should also strike the damages assessed to the individual defendants, because they cannot be liable for back pay and the evidence does not support a finding for emotional distress damages. We disagree. In this case, we find that the jury award of compensatory damages is reasonable against all defendants regardless of the exact amount of damages that may be attributable to back pay and benefits and the amount attributable to other damage, even if none of the award is attributable to "emotional distress".[4]

The Second Amended Complaint included a request for damages attributable to the emotional distress Shales suffered as a result of the actions of the defendants,

---

[4] As the parties did not ask the jury to earmark which part of the damages were to compensate Shales for his monetary losses and which for his emotional losses, we cannot be certain how much of the award is attributable to emotional distress. However, we are confident that even if the entire award against the union was to compensate Shales for purely monetary losses, it is still a reasonable award. Likewise, the amounts assigned to each defendant are reasonable as either emotional distress damages or as a recognition of the role each defendant played in depriving Shales of his rights with respect to the union, and his subsequent loss of pay and benefits. *See, e.g. Benton v. Robinson*, No. 85 C 10324, 1990 WL 251745 (N.D.Ill., Dec. 21. 1990) (recognizing that a plaintiff cannot recover back pay from individual defendants, and recharacterizing a jury's compensatory award against individual defendants as one for "money damages").

and the parties agreed to a jury instruction regarding such damages, as well as damages for loss of reputation, or other damages. Although it is true that emotional distress damages "cannot be awarded absent a showing that [Shales] suffered demonstrable emotional distress; he may not simply present facts from which the jury may infer such distress occurred." *Alston v. King*, 231 F.3d 383, 388-389 (7th Cir. 2000), the jury instruction also allowed damages for such injuries as loss of reputation. And the evidence presented at trial was sufficient that a reasonable jury could conclude that Shales suffered such a loss. There was testimony that various union officials lied about Shales during the hearings on various grievances against him, publicly denigrated his attempts to obtain information about the charges, and had him followed. Thus, even if the evidence might fall short of demonstrating emotional distress (and we refrain from finding that it does), there was certainly enough evidence to support a loss of reputation and justify the damages assigned by the jury.

## 2. Punitive Damages

The Supreme Court directed courts reviewing punitive damage awards to consider three guides: (1) the degree of reprehensibility of the conduct; (2) the disparity between the actual harm suffered and the punitive damage award; and (3) the difference between the punitive damages awarded and penalties imposed in similar cases. *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996). The Supreme Court has recognized that there are limits on acceptable punitive damage awards and that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due

20

process." *State Farm Mut. Auto Ins. Co. v. Campell,* 123 S.Ct. 1513, 1524 (2003).

In this case, the jury awarded plaintiff punitive damages of $250,000 , with compensatory damages of $171,500. Plaintiff points out that ratio of punitive damages to compensatory damages is less than 2 to 1. Plaintiff claims, and we agree, that "the modest ration of punitive damages awarded by the jury clearly falls within the single-digit multipliers, in accord with the tradition of double and treble damages, allowed by the Supreme Court in *Campell. Id.* Accordingly, we will uphold the jury's award of punitive damages.

## IV. Conclusion

As we have found that the jury's verdict was reasonable in light of the evidence presented at trial, we DENY defendants' request for a new trial pursuant to Fed.R.Civ.P. 59. *See Smith* 969 F.2d at 434 holding that "a district court may properly grant a new trial if the verdict is contrary to the clear weight of the evidence." For the same reasons, we also deny defendants' motion to enter judgment in favor of them on any of the issues raised, and decline to adjust the jury's award of damages. It is so ordered.

ENTER:

**MICHAEL T. MASON**
**United States Magistrate Judge**

Dated:   August 27, 2003